IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JIMMIE C. GARDNER,

                Petitioner,

v.                                    CIVIL ACTION NO.   2:12-cv-03386

DAVID BALLARD,

                Respondent.

## MEMORANDUM OPINION AND ORDER

The issue before the court is the constitutionality of holding a man in prison for more than twenty-five years after the state convicted him using false testimony and the state circuit court inexplicably allowed his habeas petition to languish for over two decades.

In 1993, the Supreme Court of Appeals of West Virginia ("SCAWV") was confronted with a pattern of misconduct by the state's head serologist, Fred Salem Zain, which the SCAWV described as "shocking" and representing "egregious violations of the right of a defendant to a fair trial. They stain our judicial system and mock the ideal of justice under the law." *In re W. Va. State Police Crime Lab.*, 438 S.E.2d 501, 508 (W. Va. 1993) ("*Zain I*").

Jimmie C. Gardner—an inmate at Mount Olive Correctional Complex whose trial was tainted by Zain's false testimony—was one of many denied a fair trial during

Zain's tenure. Unfortunately for Gardner, the mockery of justice has endured; the state circuit court has failed to rule on the merits of Gardner's habeas corpus petition to this day, delivering a complete miscarriage of justice.

Gardner has petitioned this court for a writ of habeas corpus under 28 U.S.C. § 2254, seeking relief from his 1990 conviction on charges stemming from an attack on Wilma Galati. *See State v. Gardner*, No. 89-F-153 (Cir. Ct. W. Va. March 5, 1990).[1] Zain was a critical prosecution witness at Gardner's trial and provided expert testimony that, based on his serology analysis, Gardner could not be excluded as the perpetrator. The parties now stipulate, however, that Zain's lab reports *did* exclude Gardner as Galati's perpetrator. Gardner was blood type A, yet the seminal fluid identified on the Galati vaginal swab was type O. Apart from Zain's forensic testimony, the evidence linking Gardner to the attack was testimony that a fingerprint lifted from a vase at Galati's home matched Gardner. At trial, Galati was surprisingly unable to identify Gardner as her assailant, though she testified she had clearly seen her perpetrator and had described the perpetrator in detail.

In the years following Gardner's trial, Zain was investigated and found to have a "long history of falsifying evidence in criminal prosecutions." *Zain I*, 438 S.E.2d at 503. In 1993, the SCAWV took the extraordinary step of appointing retired Circuit Judge James O. Holliday to conduct an investigation of the Serology Division of the

---

[1] All of the charging instruments, trial transcripts, and state court proceedings referenced in this order relate to Gardner's criminal proceeding, *State v. Gardner*, No. 89-F-153 (Cir. Ct. W.Va. March 5, 1990), or his collateral appeals therefrom, and were attached as exhibits in the instant case. For ease of reference, these documents will be referred to descriptively using the ECF number from this docket.

West Virginia State Police Crime Laboratory and to determine whether "habeas corpus relief should be granted to prisoners whose convictions were obtained through the willful false testimony of Fred S. Zain, a former serologist."[2] *Id.* at 502. In *Zain I*, the SCAWV adopted the findings of Judge Holliday's report, which concluded that Zain's "pattern and practice of misconduct completely undermined the validity and reliability of any forensic work he performed or reported." *Id.* at 504.[3] "[A]s a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." *Id.* at 506. Accordingly, the SCAWV set forth the standards of review for resolving habeas claims based on Zain's testimony, and directed the clerk of the SCAWV to prepare and distribute a special post-conviction habeas corpus form to the

---

[2] This independent investigation was ordered by the SCAWV following the 1992 reversal of defendant Glen Dale Woodall's conviction, after DNA testing had conclusively established that he was not the perpetrator. Zain had offered inculpatory evidence at Woodall's trial. Thereafter, an internal audit of Zain's work was conducted by the West Virginia State Police, which identified certain improprieties, but no material errors. The state prosecutor then requested an independent investigation, which was ordered by the SCAWV in 1993. *See Zain I*, 438 S.E.2d at 509–10.

[3] Judge Holliday's report specifically detailed the following abuses:

> The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results.

*Zain I*, 438 S.E.2d at 503.

3

West Virginia Division of Corrections with an eye toward identifying those seeking relief on Zain issues. *Id.* at 506–07.

Though Gardner diligently and persistently sought habeas relief pursuant to *Zain I* in the state courts, and despite the avowed falsity of Zain's testimony at his trial, Gardner continues to wait for a court to act. The Circuit Court of Kanawha County has avoided a final ruling on the merits, despite being ordered to conduct a full evidentiary hearing multiple times by the SCAWV. Gardner has been in legal purgatory: the state courts have deprived him of the relief he seeks, but because they have not officially denied his petitions on the merits, he has been unable to turn to the federal courts for relief. *See* 28 U.S.C. § 2254(b)(1)(A) (requiring exhaustion of state remedies before seeking a federal writ of habeas corpus). The SCAWV's report condemning Zain's pattern of falsifying evidence in criminal prosecutions was an indictment of our judicial system; the failure of the system—for decades in Gardner's case—to right the plainly acknowledged wrongs of the past is its emphatic conviction.

Gardner filed his § 2254 petition in this court on July 17, 2012. Because of the state circuit court's inordinate delay and failure to advance Gardner's proceeding, I excused Gardner from exhausting state remedies before proceeding on his federal habeas petition. Order 11–12, Nov. 12, 2013 [ECF No. 17]. Now pending before the court are a Motion for Summary Judgment [ECF No. 47] filed by the petitioner and a Motion for Summary Judgment [ECF No. 45] filed by the respondent. After painstaking consideration, and for the reasons described below, I **GRANT** the

petitioner's Motion for Summary Judgment as to Ground One for relief (i.e., the State's use of false evidence at trial), and **DENY** the Motion as to the remaining grounds. Similarly, I **DENY** the respondent's Motion for Summary Judgment on Ground One and **GRANT** the Motion on the remaining grounds.

## I.    PROCEDURAL BACKGROUND

In May 1989, Gardner was indicted and subsequently tried in connection with attacks on two women, Wilma Galati and Lillian Ruckman. Indictment [ECF No. 23-1]. Though the state's theory was that the same perpetrator was responsible for both attacks, a jury acquitted Gardner of the charges relating to Ruckman, and convicted him of the charges stemming from the Galati attack: sexual assault, robbery, felony assault, and breaking and entering. Parties' Joint Proposed Findings of Fact ¶¶ 9, 11–12 [ECF No. 56] ("Stipulated Facts"). On March 5, 1990, Gardner was sentenced to an aggregate indeterminate term of 33 to 110 years in prison, of which he has served more than 25 years.[4] *Id.* ¶ 13.

On November 16, 1993, Gardner filed a Petition for a Writ of Habeas Corpus with the SCAWV, seeking relief under *Zain I.* Pet. Writ Habeas Corpus, Nov. 16, 1993 [ECF No. 44-1, at 17]. The SCAWV granted the petition and remanded Gardner's case to the Circuit Court of Kanawha County for further proceedings. SCAWV Order, Dec. 8, 1993 [ECF No. 44-1, at 27]. The SCAWV ordered the Circuit Court of Kanawha

---

[4] Following his conviction, Gardner appealed to the SCAWV challenging the sufficiency of the evidence presented at trial, and the appeal was summarily denied. Pet. for Appeal, March 5, 1991 [ECF No. 44-1, at 1]; SCAWV Order, June 26, 1991 [ECF No. 44-1, at 15].

County to conduct a full evidentiary hearing or omnibus habeas corpus hearing on Gardner's case at least three times—in 1995, 2002, and 2005—yet they seem to have never materialized. *See* SCAWV Order, March 1, 1995 [ECF No. 44-1, at 74]; SCAWV Order, July 2, 2002, [ECF No. 44-1, at 82]; SCAWV Order, Nov. 29, 2005 [ECF No. 44-1, at 97].

Gardner filed his § 2254 petition in this court on July 17, 2012 [ECF No. 2], and I excused the § 2254(b)(1)(A) exhaustion requirement on November 12, 2013. Order 11–12, Nov. 12, 2013 [ECF No. 17]. This matter is now proceeding on Gardner's pro se Amended Petition [ECF No. 22], filed on January 24, 2014, and also on the Supplemental Petition [ECF No. 43], filed by the petitioner's court-appointed counsel on October 31, 2014.

The grounds for relief contained in the Amended Petition and Supplemental Petition are renumbered as follows: (1) the state used false evidence (i.e., testimony of Zain) to obtain a conviction, (1A) the state withheld exculpatory *Brady* materials (i.e., underlying raw data sheets), (2) trial counsel was ineffective for failing to follow up on exculpatory Zain reports, (2A) trial counsel was ineffective for failing to object to the chain of custody of the fingerprint evidence, (3) trial counsel was ineffective by not hiring appropriate fingerprint and serology experts, (4) the trial court denied due process by not continuing the case despite late disclosure of evidence, (5) the trial court held a hearing on fingerprint evidence in petitioner's absence, (6) the judge had improper communications with the jury in petitioner's absence, (7) the right to a fair

trial was impaired when the prosecutor improperly advised the jury on intent, (8) the robbery jury instruction was constitutionally deficient, (9) the trial court improperly advised the jury that fists were deadly weapons, (10) the burglary jury instruction was constitutionally deficient, (11) the fingerprint evidence was insufficient as a matter of law to sustain a conviction, and (12) the state knowingly presented false evidence to the grand jury.[5]

On December 9, 2014, the respondent filed a Motion for Summary Judgment [ECF No. 45], to which the petitioner timely responded and simultaneously filed his own Motion for Summary Judgment [ECF No. 47] on January 15, 2015. The respondent timely filed a Response to Gardner's Motion and Reply relating to his own Motion. [ECF No. 48]. The matter is ripe for adjudication.

## II.   STANDARD OF REVIEW

Because I excused the petitioner from the requirement to exhaust the available state court remedies prior to filing his § 2254 petition, there is no state court decision for me to review under 28 U.S.C. § 2254(d). Rather, the parties do not dispute that each of the petitioner's claims for habeas corpus relief are subject to de novo review. *See Winston v. Kelly*, 592 F.3d 535, 553–54 (4th Cir. 2010) ("When a claim has not been adjudicated on the merits by the state court, a federal court reviews the claim de novo."). The parties further agreed that an evidentiary hearing was not necessary

---

[5] Gardner withdrew three additional counts from his Amended Petition. *See* Suppl. Pet. 2 (withdrawing claim XII of his Amended Petition); Pet'r's Mot. Summ. J. 6, n.4 (withdrawing claims XIII and XIV of his Amended Petition).

and submitted Stipulated Facts.

Rule 56 of the Federal Rules of Civil Procedure regarding summary judgment applies to habeas corpus proceedings. *See, e.g., Blackledge v. Allison*, 431 U.S. 63, 80 (1977); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991). Entry of summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. RELEVANT TESTIMONY AND FACTUAL BACKGROUND

The following facts are taken from the Stipulated Facts submitted by the parties on August 24, 2015, or are based on my own review of the evidence of record. In addition to the facts set forth in the Stipulated Facts, the parties stipulated that the exhibits filed as part of their pleadings are what they purport to be. Stipulated Facts ¶ 18.

Wilma Galati and her mother, Bethel Ferrell, were attacked in their home on May 16, 1987. *Id.* ¶ 1. The parties stipulate that, when police responded to the scene, Galati described her attacker as a medium-toned skin black man with a slender nose and slim to medium build. *Id.* ¶ 2. On July 24, 1987, Lillian Ruckman was attacked in her home in a similar manner. *Id.* ¶ 3.[6] Both attacks occurred in the Kanawha City area of Charleston, West Virginia. *Id.* ¶ 4. The subsequent police investigation of the attacks involved over one hundred suspects and included interviews of African-

---

[6] Both Galati and Ruckman claimed to have been beaten and raped by their attacker; Ferrell was not raped, but was severely beaten. Trial Tr. vol. I, 74:1–2 [ECF No. 43-3]; Trial Tr. vol. II, 210–11 [ECF No. 43-4].

American baseball players for the Charleston Wheelers, whose stadium was located in Kanawha City. *Id.* ¶¶ 5–7. At the time, Gardner was a pitcher for the Wheelers. *Id.* ¶ 8.

In its opening statement, the State explained that it would tie Jimmie Gardner to the case by forensic serology, to be presented by Zain, and fingerprint evidence. Trial Tr. vol. I, 47:3–48:5 [ECF No. 43-3]. The State explained that Zain would "be here to explain to you that Jimmie Gardner cannot be excluded from either case as the perpetrator of these crimes. In other words, Jimmie Gardner could have perpetrated these crimes from the opinion of the serologist." *Id.* at 48:6–10. The State's theory of the case relied on evidence of modus operandi to establish that the same individual committed both attacks. *Id.* at 48:16–51:22.

### A.  The Victims' Trial Testimony

At trial, neither woman was able to identify Gardner as her assailant, though both testified they had clearly seen their perpetrator and were able to describe him in detail. Trial Tr. vol. I, 67:8–68:13; Trial Tr. vol. II, 204:8–13, 207:7–208:13 [ECF No. 43-4].

Galati testified about how her attacker threw her mother to the ground. Galati also described how Galati was repeatedly struck in the face before being forcibly raped. Stipulated Facts ¶ 19. Galati could never identify Gardner as her assailant. *Id.* ¶ 20. When asked if she saw her attacker in the courtroom, she responded, "I'm not sure." *Id.* ¶ 22; Trial Tr. vol. I, 79:10–15. Galati testified that her attacker was a

black man who was about six feet tall, with "short" hair, a "narrow nose", "penetrating eyes;" and a build that was "very muscular; like an athlete." Trial Tr. vol. I, 67:21–68:13; Stipulated Facts ¶ 21. She also testified that his complexion was medium. Stipulated Facts ¶ 21; Trial Tr. vol. I, 95:13 ("He wasn't as black-black."). She described him as neat, with no facial hair. Stipulated Facts ¶ 21. Galati further testified that her attacker touched several items in her home, including a jewelry box that he picked up and examined. *Id.* ¶ 23.

Like Galati, Ruckman testified that her attacker did not have a wide nose and that his lips were "thinner for [sic] normal lips on a Negro." *Id.* ¶ 24. Ruckman did not identify Gardner as her attacker. *Id.* ¶ 25. Detective Russell Flowers testified that Ruckman had previously identified Gary Hatchett as her attacker after viewing him in a photo lineup, exclaiming "[t]here's no doubt in my mind." *Id.* ¶ 26; Trial Tr. vol. III, 543:4–9 [ECF No. 43-5]. Detective Flowers told the jury Ruckman explained why she had picked the photograph of Hatchett: "Because it is the guy. His eyes were the same, sad, piercing eyes that I saw; he's got a sad yet gentle look on his face; I remember his neck; it's the same neck; his nose and mouth look just like I remember." *Id.* at 543: 21–24. Detective Flowers also testified that, on two separate occasions, Ruckman had been shown a photo lineup containing a photo of Gardner, but she did not identify him as her attacker. *Id.* at 556:9–21, 559:10–18.

## B. The Fingerprint Evidence

Shortly after the attack, West Virginia State Police Lieutenant David Shumate

lifted a fingerprint off a vase found in Galati's home and provided a copy to Detective Kenneth Cartwright. Stipulated Facts ¶ 27. On August 7, 1987, during his interview, Gardner agreed to provide his fingerprints to police; the prints were provided to Shumate in August 1987.[7] *Id.* ¶¶ 28–29. Nearly two years later, on May 9, 1989, Shumate compared Gardner's fingerprint to the fingerprint impression recovered from the vase in Galati's home and concluded it was a match. *Id.* ¶ 30; Shumate Fingerprint Report, May 9, 1989 [ECF No. 23-1, at 62].

Cartwright also submitted the latent print from the vase to the FBI for review. *Id.* ¶ 31. In his request for FBI review, Cartwright opined that the "position of the latent on the vase would indicate it was made by the suspect[']s left thumb." *Id.* ¶ 32. The FBI responded by notifying Cartwright that it appeared that he submitted a photograph of two latent fingerprints. *Id.* ¶ 33.

The vase from which the print was lifted was also provided to Zain, who examined the vase and concluded that human blood was present. *Id.* ¶ 34. During trial, the State called Shumate as an expert witness in fingerprint analysis, and Shumate testified "the latent fingerprint from the vase is a print of the left middle finger of Jimmie Gardner." Trial Tr. vol. II, 482:6–7; Stipulated Facts ¶ 36.

### C. Zain's Written Reports

Zain issued several pre-trial forensic reports, which were not provided to the

---

[7] According to Detective Flowers's grand jury testimony, when the Criminal Investigation Division of the Charleston Police Department was reviewing a number of suspects' fingerprints in 1987, "Gardner was checked and we just missed his fingerprints." Flowers Grand Jury Testimony, June 14, 1989, at 9 [ECF No. 23-1, at 64].

11

jury, but about which Zain testified. On June 11, 1987, Zain issued a report addressing the forensic testing performed on evidence collected from Galati, Farrell, and their home following the attack. Zain Report on Galati Sample, June 11, 1987 [ECF No. 43-15]. The report specifically stated that "[s]eminal fluid and spermatozoa were identified on the vaginal smear slides and swabs" ("the Galati sample") and that the "seminal fluid identified on the vaginal swab contained the following genetic markers":

| SYSTEM | MARKER[8] |
|--------|-----------|
| ABO | O (H) |
| PGM | 2+, 1+ or 2+1+ |
| GLO I | 2 |

*Id.* The report also listed the following relevant genetic markers found in the known blood specimen of Galati:

| SYSTEM | MARKER |
|--------|--------|
| ABO | O |
| PGM | 2+1+ |
| GLO I | 2 |

*Id.*

On June 21, 1988, Zain issued another report comparing the known genetic markers of Gary Hatchett, the suspect positively identified by Ruckman, to the evidence in the Galati case addressed above. Zain Report on Hatchett, June 21, 1988 [ECF No. 43-10]. The June 21, 1988 report listed the following genetic markers for

---

[8] The results show the presence of specific protein enzymes in blood or bodily fluids. Where such genetic markers are present in bodily fluids, the test subject is called a "secretor." The "H" indicates that the individual is a secretor. Trial Tr. vol. II, 391–393.

the known blood sample of Gary Hatchett:

| SYSTEM | MARKER |
|--------|--------|
| ABO | O |
| PGM | 1+ |
| GLO | 2 |

*Id.* The June 21, 1988 report concluded that the "[g]enetic markers of Gary Hatchett were consistent with the genetic markers identified" in the Galati sample. *Id.*

Zain's May 26, 1989 forensic report analyzed a known blood sample from Gardner and reported the following genetic markers:

| SYSTEM | MARKER |
|--------|--------|
| ABO | A |
| PGM | 2+, 1- |
| GLO | 2 |

Zain Report on Gardner, May 26, 1989 [ECF No. 43-16]. The report made no comparison to any vaginal swab samples. *Id.*

The parties stipulate that Zain's reports "exclude[ ] Gardner as a possible depositor of the seminal fluid found in the Galati sample . . . because Gardner is ABO blood type A," Stipulated Facts ¶¶ 55–56, yet the seminal fluid identified on the Galati vaginal swab was type O. Zain Report on Galati Sample, June 11, 1987.[9]

### D. Zain's testimony

The State summoned Zain to testify at Gardner's trial as an expert in forensic

---

[9] In their Stipulated Facts, the parties state that it was Zain's June 21, 1988 report that excluded Gardner as a possible depositor of seminal fluid in the Galati sample. Stipulated Facts ¶¶ 55–56. Yet the report of this date discusses the genetic markers of Gary Hatchett. *See*, Zain Report on Hatchett, June 21, 1988. I believe the parties to have made a simple error in reference to the date of the report they were discussing.

serology who analyzed evidence in Gardner's case. Stipulated Facts ¶ 36. Zain testified longer than any other witness at Gardner's trial. *Id.* ¶ 49.

Zain testified that male semen was present on the Galati vaginal swabs. *Id.* ¶ 37. Zain also testified that he could neither include nor exclude Gardner as the semen depositor in Galati's case, Stipulated Facts ¶ 39, even though Zain testified that Gardner's known blood sample had the following genetic markers:

| SYSTEM | MARKER |
|--------|--------|
| ABO | A |
| PGM | 2+1- |
| GLO | 2 |

Trial Tr. vol. II, 421:9–13. Thus, Gardner's ABO and PGM markers were inconsistent with the evidence from the Galati sample, and, as the parties stipulated, should have excluded him as a suspect in the Galati sexual assault. *See* Zain Report on Galati Sample, June 11, 1987 (showing the Galati sample had ABO type O and PGM 2+, 1+ or 2+1+). During his testimony, Zain attempted to explain away this discrepancy as follows:

> Q. And how does Mr. Gardner's blood groupings compare with Mrs. Galati's case.
>
> A. With Mrs. Galati's case there's really no blood typings as far as the ABO. There again, that could include him, except based straight out on the quantitation if I was able to determine how much semen was there, that may have been a little more informative. But from the scientific standpoint, I don't have enough information to really make the comparison other than certain blood types. Even ABO blood type is not, you know, certainly not showing up. The PGM blood type does not fit in. The glyoxalase is the same; they are both secreters [sic; secretors].

14

> Scientifically, I really can't make a direct comparison because of a lack of information from the case, more or less.

Trial Tr. vol. II, 421:14–422:5.[10]

Although Zain admitted that the ABO marker for Gardner was type A, whereas his report indicated that the Galati sample was type O, he testified that the quantity of semen in the Galati sample was inadequate to conclusively exclude Gardner as a suspect. On cross-examination, Gardner's counsel questioned Zain as follows:

> Q.    . . . [I]f you were to make a comparison of what was found on Wilma Galati's vaginal swabs with Jimmie Gardner's blood types . . . you would have to exclude Mr. Gardner because he has an ABO type A and there was no ABO type A found on the vaginal swab.
>
> A.    That's correct. There was no ABO type A identified on the vaginal swab.
>
> Q.    Okay. And that would -- that finding would exclude him from consideration as the person who attacked Wilma Galati, that determination, is that correct?
>
> A.    To answer your question correctly, I stated earlier also that the secretion identified, that seminal fluid was identified on the swab, but to determine the quantity of semen appropriately which I gave an example of, *I can't say one way or the other whether the blood typings came from the semen or whether it came from the vaginal fluid specifically*. There are no mixture of blood types to really be derived in general terms. To answer your question directly, didn't, in fact, all the blood characteristics identified did come from the semen donor then it would exclude Mr. Gardner, but there's no way of me knowing one way or the other at least

---

[10] With regard to a stain or fluid sample believed to be a semen stain or mixture of semen and vaginal fluids, Zain stated, "we would determine what those bodily fluids are from the particular stain and try to individualize what portion of the stain came from the semen donor and what portion of stain originated from, of course, the female." Trial Tr. vol. II, 388:1–8.

with the testing that was available at the time.

*Id.* at 442:9–443:9 (emphasis added). The cross-examination of Zain continued as

follows:

> Q.    In other words, what you're saying is you determined that you were  unable to express an opinion as to whether or not Jimmie Gardner should be excluded because there was an inadequate amount of seminal material for you to make the comparison?
>
> A.    Absolutely.
>
> . . . .
>
> Q.    Now, are you, Mr. Zain, the same F.S. Zain, and Sergeant, who found an adequate amount of seminal fluid in the WG (VS), the way we're referring to it here, of Wilma Galati in order to make a comparison with one Gary Hatchett and reach a scientific conclusion that the genetic markers of Gary Hatchett were consistent with the genetic markers identified from the vaginal swab previously submitted and reported as S-87236. Are you that same individual?
>
> A.    Yes, sir.

*Id.* at 444:8–445:1.

Zain's testimony that he was not sure whether the results from the Galati

sample were from semen or vaginal fluid directly contradicted his June 11, 1987 lab

report, which stated that the blood typing was performed on the "seminal fluid

identified on the vaginal swab." Zain further stated that, based upon an inadequate

amount of seminal fluid in the Galati sample, he could reach no conclusions about

Gardner's involvement with Galati's rape, even though he had made such a

conclusion regarding Gary Hatchett using the same findings.

With respect to Ruckman's case, Zain testified that he found seminal fluid and

16

a small pubic hair present on the vaginal slide; he testified the hair was of "Negroid origin." Stipulated Facts ¶ 41. Zain testified that Gardner was included in the 0.18 percent of the population that could have been responsible for the semen sample recovered from Ruckman. *Id.* ¶ 43.

The parties also stipulate that Zain testified that Hatchett—another suspect in the attacks and the person positively identified by Ruckman as her attacker—was totally excluded as a possible semen donor in both cases. *Id.* ¶ 44. Zain had previously reported, however, that the "[g]enetic markers of Gary Hatchett were consistent with the genetic markers identified from the vaginal swab previously submitted and reported as S-87-236," which was the case number assigned to the Galati case. *Id.* ¶ 45 (quoting Zain Report on Hatchett, June 21, 1988).

### E.  Closing arguments

In its closing argument, the State argued at length that the testimony of both Zain and Shumate was inculpatory of Gardner. Stipulated Facts ¶¶ 46–47. The State also argued that the similar modus operandi suggested the same perpetrator was responsible for both attacks. *Id.* ¶ 48. The State further heavily relied on Zain's testimony at closing by arguing that Gardner belonged to the 0.18 percent of the population that could have been responsible for the Ruckman attack. *Id.* ¶ 50. The prosecutor also reminded the jury that Hatchett was completely eliminated as a suspect based on Zain's testimony. *Id.* ¶ 51.

Gardner's trial counsel argued in closing that neither Galati nor Ruckman

identified Gardner as the perpetrator and that the serology evidence excluded him. *Id.* ¶¶ 52–53.

## IV.  ANALYSIS

### A.  Ground 1—False Evidence

In his Supplemental Petition, Gardner contends that his constitutional rights were violated by the admission of false evidence at trial, namely the testimony and evidence presented by Zain. Suppl. Pet. 12.

It is clearly established that a due process violation occurs when the State convicts a defendant based upon false evidence, even when the prosecutor is unaware of the falsity. *See, e.g., Giglio v. United States*, 405 U.S. 150 (1972); *Miller v. Pate*, 386 U.S. 1 (1967); *Napue v. Illinois*, 360 U.S. 264 (1959). Applying this standard to the Zain context, the SCAWV held, "it matters not whether a prosecutor using Trooper Zain as his expert ever knew that Trooper Zain was falsifying the State's evidence. The State must bear the responsibility for the false evidence. The law forbids the State from obtaining a conviction based on false evidence." *Zain I*, 438 S.E.2d at 505. "[O]nce the use of false evidence is established, as here, such use constitutes a violation of due process." *Id.* at 506.

To determine whether such a violation warrants habeas relief, however, I must determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*,

551 U.S. 112, 121 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* . . . ."). Similarly stated, habeas petitioners must establish that the error resulted in "actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2189 (2015) (quoting *Brecht*, 507 U.S. at 637).

This standard is consistent with the standard enunciated in *Zain I* for addressing state habeas proceedings based on false Zain testimony. *Zain I* stated that once the use of false evidence (i.e., Zain testimony) is established, "[t]he only inquiry that remains is to analyze the other evidence in the case under the *Atkins* [harmless error] rule to determine if there is sufficient evidence to uphold the conviction." 438 S.E.2d at 506 (citing *State v. Atkins*, 261 S.E.2d 55 (W. Va. 1979)). The test to determine whether the error is harmless is as follows:

> (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, *an analysis must be made to determine whether the error had any prejudicial effect on the jury.*

*Id.* (emphasis added) (quoting syl. pt. 2, *Atkins*, 261 S.E.2d 55); *see also Ward v. Trent*, No. 98-7267, 1999 WL 638606, at *5 (4th Cir. 1999) (unpublished table decision) ("We conclude that the West Virginia Supreme Court of Appeals set forth the proper standards to be applied in reviewing Zain/serology claims.").[11]

---

[11] The petitioner's Supplemental Petition cites *Brecht* and *Kotteeakos*, stating that this harmless error standard is consistent with the holding in *Zain I* and is the appropriate standard for determining

When a conscientious judge is uncertain as to the likely effect of the error on the jury's verdict—meaning the judge "feels the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error"—the judge should treat the error as if it affected the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995) (discussing the application of the *Brecht* "substantial and injurious effect or influence" standard for determining harmlessness in federal habeas cases). In other words, "in cases of grave doubt as to harmlessness the petitioner must win." *Id.* at 437.

The SCAWV has already determined that the Zain evidence was false and therefore, constitutional error occurred when that evidence was used at Gardner's trial. *See Zain I*, 438 S.E.2d at 506 (agreeing with Judge Holliday's assessment that, "as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding"). I will issue a writ of habeas corpus unless this error was harmless. Thus, two issues remain for this court. First, whether the non-Zain evidence was sufficient to support a conviction. Second, and most critical to my decision, whether the Zain evidence had a substantial and injurious effect on the

---

the effect of Zain's false evidence. Suppl. Pet. 26–27. The respondent also cites to the *Zain I* standard as proper and recognized by the Fourth Circuit in *Ward*, 1999 WL 638606, at *5, but the respondent appears to overlook the crucial third step of required analysis dealing with whether the false evidence prejudiced the jury. Mem. Supp. Resp't's Mot. Summ. J. 7 [ECF No. 46].

jury's verdict—in other words, whether the Zain's testimony had a substantially prejudicial effect on the jury.

### 1. Sufficiency

Excluding the serology evidence, the remaining evidence is slim. The only evidence linking Gardner to the Galati assault was expert testimony that Gardner's fingerprint was a match to a fingerprint found on a vase in the Galati residence. *See* Stipulated Facts ¶ 35. Despite the discrepancies as to which finger appeared in the latent print,[12] I will assume, without deciding, that the fingerprint evidence, taken in the light most favorable to the State, provided a measure of circumstantial evidence that was sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt.[13]

### 2. Prejudice

The final and most significant aspect of my analysis is whether Zain's testimony had a substantial and injurious effect on the jury's verdict. *See Zain* I, 438 S.E.2d at 506; *Brecht*, 507 U.S. at 637. The parties are in fundamental disagreement about the effect of Zain's testimony on the petitioner's jury verdict.

---

[12] There appeared to be a discrepancy, acknowledged by the parties in their Stipulated Facts, as to which finger made the print and how many prints were visible in the photo. Stipulated Facts ¶¶ 29–35. *Compare* Cartwright Letter to FBI [ECF No. 23-1, at 53] (enclosing "a photograph of a latent fingerprint" which appears to be made by the suspect's "left thumb"), *with* FBI Letter to Cartwright [ECF No. 23-1, at 54] ("Two latent fingerprints of value appear in the submitted photograph."), *and* Shumate Report [ECF No. 23-1, at 62] ("[T]he latent fingerprint is a print of the left middle finger of Jimmie Gardner.").

[13] I am not persuaded by petitioner's argument in Count XI of his Amended Petition that a single fingerprint on a moveable object is insufficient to support a conviction as a matter of law in West Virginia. Am. Pet. 74.

Gardner maintains that Zain's testimony was obviously prejudicial because it included him as a suspect and "nullified the defense theory that another suspect, Hatchett, was the real perpetrator." Suppl. Pet. 27. The respondent, on the other hand, attempts to minimize the import of Zain's testimony, characterizing it as "a wash for both sides," which could not have been prejudicial. Mem. Supp. Resp't's Mot. Summ. J. 7; *see also, e.g.*, *id.* ("Although Zain did not exculpate Gardner, he did not inculpate him either."); *id.* ("[H]is testimony was limited to opining that the DNA evidence was inconclusive."); *id.* at 4–5 (describing Zain's testimony as being "of minimal consequence" because he testified only that "he could not exclude Gardner from being the assailant in the Galati case").[14]

The petitioner's Motion for Summary Judgment and Response to the respondent's Motion for Summary Judgment again asserted that Zain's testimony was significant to the State's case at trial:

> In the heat of trial, when it needed to convince a jury to convict Gardner, Zain's testimony "nailed" him, in the State's words. Now, years later, after Zain's malfeasance has been fully aired and Gardner is seeking vacation of his convictions, the same testimony, to Respondent's thinking, is inconsequential. Both things cannot be true. This court should credit the original prosecution, which showed the key role Zain's testimony played in Gardner's conviction.

---

[14] The respondent cites to a footnote of a West Virginia case for the proposition that the inculpatory nature of evidence is relevant to whether Zain's testimony was prejudicial. Mem. Supp. Resp't's Mot. Summ. J. 7 (citing *State v. Trent*, 504 S.E.2d 165, 171 n.10 (W. Va. 1998)). The court in that case, however, described Zain's testimony as not inculpatory because it did not relate to tying the defendant to a crime; Zain's testimony was about linking victims to stains on items found at the victims' home. *Id.* at 170–71 ("This case is unique because Trooper Zain did not use serological evidence to identify the appellant as the perpetrator or even link the appellant to the scene of the crime. In fact, Trooper Zain did not inculpate the appellant in any way."). Here, Zain's testimony is specifically concerned with tying Gardner to the crime.

Pet'r's Mot. Summ. J. 4; *see also* Trial Tr. vol. III, 748:5. I agree with the petitioner.

Zain's testimony and presentation of the serology evidence was critical to tying Gardner to the sexual assaults. *See Atkins*, 261 S.E.2d at 62 ("The more tangential the error to the ultimate issue of guilt, the less likely its prejudicial impact"). Faced with scant circumstantial evidence, the prosecutor placed great emphasis on Zain's testimony, which allowed the jury to believe that Gardner could not be excluded as a suspect in the Galati assault. *See* Stipulated Facts ¶ 39. Zain testified during direct examination that the blood typings might *include* Gardner if the semen sample had been large enough, when the results of the tests actually *exclude* Gardner. [15] Although the defense attempted to cross-examine Zain on inconsistencies between Zain's testimony and his forensic reports, Zain falsely denied that his forensic analysis was exculpatory—as the parties now stipulate—preventing the jury from properly weighing the serological evidence in their deliberation.

Further, Zain's testimony negated the jury's consideration of the most plausible alternate suspect in the Galati attack. Zain testified that Hatchett was totally excluded as a possible semen donor in both cases. Stipulated Facts ¶ 44. Zain's oral testimony directly contradicted Zain's written report, where he concluded Hatchett's blood typings were consistent with the Galati sample. *Id.* ¶¶ 45, 54. Yet, Hatchett—who had been positively and confidently identified by one of the victims—

---

[15] Zain's June 21, 1988 report "excludes Garner as a possible depositor of the seminal fluid found in the Galati sample," because "Gardner is ABO blood type A" and the sample was blood type O. Stipulated Facts ¶¶ 55–56.

was a more compelling perpetrator than Gardner, who was never identified by either victim, even when facing Gardner in the courtroom. *Id.* ¶¶ 20, 25.

Beyond the obvious prejudicial substance of Zain's testimony, the frequency and manner in which it was used by the prosecution also demonstrates a substantial and injurious effect on the jury. Zain testified longer than any other witness at Gardner's trial. Stipulated Facts ¶ 49. Zain's testimony spans 71 pages of the 811-page transcript. *See* Trial Tr. vol. I, 2; *see also Atkins*, 261 S.E.2d at 62 (explaining that the court "will be guided by whether the record reveals that the error was repeated or singled out for special emphasis in the State's argument"). *Cf. Brecht*, 507 U.S. at 639 (finding no substantial and injurious effect on the jury's verdict, relying partly on the infrequency of the error at trial, which comprised "less than two pages of the 900-page trial transcript"). Also, as indicated above, the prosecution gave special emphasis to Zain's testimony, both in opening and in closing. *Cf. Atkins*, 261 S.E.2d at 63 (explaining that an error was not prejudicial because "[t]here was no attempt by the prosecutor to place special or repeated emphasis on the issue" and "[n]o mention of it was made in the opening statements, and . . . defendant does not assert that the State used this issue in its closing argument"). In its opening, the State asserted that "Jimmie Gardner could have perpetrated these crimes from the opinion of the serologist." Trial Tr. vol. I, 48:8–10. And in its closing, the State argued that Zain's testimony inculpated Gardner and completely eliminated Hatchett as a suspect. Stipulated Facts ¶¶ 46, 51.

24

Also relevant is the overall quality of the State's proof.[16] *See Brecht*, 507 U.S. at 639 (noting that "the State's evidence of guilt was, if not overwhelming, certainly weighty" in its determination that a trial error had no injurious effect on the jury); *see also Atkins*, 261 S.E.2d at 63 ("If the case contains a number of substantial key factual conflicts or is basically a circumstantial evidence case . . . there is an increased probability that the error will be deemed prejudicial."); *cf. Moss v. Trent*, 603 S.E.2d 656, 661 (W. Va. 2004) (finding no prejudicial effect of Zain serology evidence where jury was also presented with Appellant's own confession, supported by an "abundance of evidence"). As has been explained above, the case against Gardner is entirely circumstantial, and the only thing linking Gardner to the Galati attack was a fingerprint. Zain's evidence was not cumulative, but it constituted unique and original evidence central to the prosecution's claim. *Cf. Brecht*, 507 U.S. at 639 (finding no substantial and injurious effect on the jury's verdict partly because the effect of the error was to present cumulative evidence).

Also compelling is the nature of the evidence Zain presented at trial—expert testimony, which "can be both powerful and quite misleading." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (quoting Jack B. Weinstein, *Rule 702 of*

---

[16] I note that the jury had great difficulty in arriving at a guilty verdict. The jury sent the court a number of questions, though the substance of those communications is not entirely clear. At one point, after the jury informed the court it was deadlocked, the court verbally questioned the jury as to their "numerical position." Trial Tr. vol. III, 798:7–13. The foreman responded that "[i]t is right at six and six." *Id.* The judge proceeded to give three additional instructions: an Allen charge, an additional instruction that "while your verdict in each count must be unanimous, each count of the indictment stands alone," and a written response to a question not in the record with the verbal instruction to continue their deliberations. *Id.* at 795:14–797:15, 799:1–2; 803:22–24. The jury deliberated a full day following the Allen charge before reaching their verdict.

*the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 Fed. R. Decisions 613, 632 (1991)). By definition, Zain's expert opinion as to whether Gardner could have been the perpetrator based on his serology analysis, carried special weight with the jury. Generally, opinion evidence is excluded, but an exception is made if "scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The special latitude afforded experts to offer their opinions "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. Zain held himself out to be the preeminent authority on serological forensic science in the State of West Virginia. Zain's testimony was supposed to help the jurors navigate the specialized and complex field of forensic serology. Unfortunately, he was not worthy of the influence he wielded.

I have absolutely no doubt that Zain's false testimony "had a substantial and injurious effect on the jury's verdict," which resulted in a complete miscarriage of justice.[17] Therefore, I **FIND** that, pursuant to the dictates of the clearly established precedent in *Brecht*, *Kotteakos*, and *Fry*, the admission of Zain's false evidence was not harmless error, and the petitioner is entitled to habeas corpus relief on the first ground asserted in his Supplemental Petition.

---

[17] Even were I less certain (i.e., in "virtual equipoise") about the prejudicial effect of Zain's testimony in this case, granting the writ would be appropriate under the Supreme Court rule that "in cases of grave doubt as to the harmlessness the petitioner must win." *O'Neal*, 513 U.S. at 437.

### B.  Other Grounds

Having granted the writ of habeas corpus on Gardner's false evidence claim, I briefly turn to the other grounds for relief asserted by Gardner. In his Amended and Supplemental Petitions, Gardner has raised numerous claims of error by the trial judge and the prosecutor, and ineffective assistance by his trial counsel. He further asserts several claims of error in the jury instructions and challenges the sufficiency of the fingerprint evidence. As noted by the respondent in his Reply brief, Gardner has not contested the arguments that the respondent is entitled to judgment as a matter of law on these other claims. Reply to Resp't's Mot. Summ. J. 2–3 [ECF No. 48].

Upon an exhaustive de novo review of the record, I **FIND** that Gardner is not entitled to habeas corpus relief on any of these other grounds, as he has not sufficiently demonstrated constitutional errors based upon the conduct of the trial court, the prosecutor or his trial counsel, or in any way demonstrated that his trial was otherwise fundamentally unfair. Accordingly, I **FIND** that there are no genuine issues of material fact and that the respondent is entitled to judgment as a matter of law on the remaining grounds for relief contained in the Amended and Supplemental Petitions.

## V.    CONCLUSION

For the reasons stated herein, it is hereby **ORDERED** that Gardner's Motion for Summary Judgment [ECF No. 47] is **GRANTED** as to Ground One (i.e., the State's

use of false evidence at trial) and **DENIED** as to the remaining grounds for relief contained in the Amended and Supplemental Petitions. It is further **ORDERED** that the respondent's Motion for Summary Judgment [ECF No. 45] is **DENIED** as to Ground One and **GRANTED** as to the remaining grounds for relief contained in the Amended and Supplemental Petitions. It is further **ORDERED** that the Amended and Supplemental Petitions for a Writ of Habeas Corpus [ECF Nos. 22 & 43] are similarly **GRANTED IN PART** and **DENIED IN PART**.

The court **ORDERS** that the petitioner's convictions are **VACATED**, and a writ of habeas corpus is **ISSUED** to the respondent. The court further **ORDERS that the State shall either retry or release the petitioner, Jimmie C. Gardner, within sixty days of the entry of this Memorandum Opinion and Order**.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to the counsel of record and to the petitioner. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:     March 25, 2016


JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

28